IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

MILTON ROSS,                     *
                                 *
        Plaintiff,               *
                                 *
        v.                       *          CV 411-198
                                 *
DOCTOR ERIC FOGAM,               *
                                 *
        Defendant.               *

─────────────

O R D E R

─────────────

Before the Court is Defendant's motion for summary
judgment. (Doc. 107.) The Clerk has given Plaintiff notice of
the summary judgment motion and the summary judgment rules, of
the right to file affidavits or other materials in opposition,
and the consequences of default. Therefore, the notice
requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th
Cir. 1985) (per curiam), have been satisfied. For the following
reasons, Defendant's motion is **GRANTED IN PART AND DENIED IN
PART**.

## I. BACKGROUND

The facts construed in Plaintiff's favor, are as follows. Plaintiff Milton Ross is an inmate at Coastal State Prison ("CSP"). (Ross Dep., Doc. 108-2, at 9.) In 2002, Plaintiff was shot in the back while fleeing from police after committing an assault and armed robbery. (Id. at 9-10, 16.) Plaintiff was convicted and sentenced to serve a life sentence. (Id.)

### A. Plaintiff's Prior Medical History

Bullet fragments have remained in Plaintiff's spine since he was shot in 2002. (Id. at 17.) Those fragments, which are too small to remove, have damaged Plaintiff's nerve tissue causing him to be in severe pain.[1] (Id. at 17-18.) In 2004, Plaintiff was diagnosed with cauda equina syndrome.[2] (Apple Report, Doc. 125-2, at 2.) Between 2002 and 2006, Plaintiff saw multiple doctors while incarcerated at Phillips State Prison ("PSP") and was further diagnosed with spinal stenosis.[3] (Id.) Plaintiff's doctors prescribed a litany of different drugs to treat his pain including Neurontin, MS Contin, Darvocent, Ultram, and Baclofen, but Plaintiff felt no relief. (Doc. 125-4, at 15, 17; Ross Dep. at 24.) In 2006, after Plaintiff had

---

[1] Describing his pain, Plaintiff testified that the "[i]nside of [his] rectum feel[s] like an open wound." (Ross Dep., at 18.)

[2] Cauda equina syndrome "is a problem caused by an injury to the nerves at the end of the spinal cord," which causes "loss of feeling in the lower extremities, loss of bowel and bladder control and chronic pain." (Apple Report at 2.)

[3] Spinal stenosis "describes the loss of the normal size of the bony spinal canal that protects the spinal cord and cauda equine." (Apple Report at 3.)

been given every "medicine conceivable, none of which worked," Plaintiff's doctor began to consider implanting a spinal cord stimulator ("SCS"). (Doc. 125-4, at 23.) An SCS is an implantable device that uses electrical currents to block pain signals. (Apple Dep., Doc. 108-3, at 9.)

On September 26, 2006, Plaintiff met Dr. Efrim Moore, a pain management specialist who decided Plaintiff was a proper candidate for an SCS implant. (Doc. 125-10.) A temporary implant was placed in October 2006 and Plaintiff reported a greater than fifty-percent pain reduction as a result thereof. (Doc. 125-12.) A permanent SCS was implanted on December 15, 2006. (Id.)

On August 13, 2010, Plaintiff underwent surgery to repair a fractured lead on his SCS. (Apple Report at 4.) Shortly after this surgery, Plaintiff started exhibiting symptoms of a life-threatening infection. (Id.) Because of this infection, which was later revealed to be methicillin-resistant Staphylococcus aureus ("MRSA"), doctors were forced to remove Plaintiff's SCS. (Fogam Aff., Doc. 111, ¶ 8.) The doctors who removed Plaintiff's SCS allegedly recommended that Plaintiff see a specialist to discuss future treatment. (Doc. 125-24, at 2; Ross Dep. at 37.) After his hospitalization, Plaintiff was transferred to Men's State Prison ("MSP") on October 21, 2010. (Doc. 125-23, at 2.) With the SCS removed, Plaintiff's pain

returned to his pre-implant levels. (Houten Dep., Doc. 110, at 150.)

## B. Defendant's Treatment Between 2010 and 2012

Plaintiff was transferred to Coastal State Prison ("CSP") on November 17, 2010. (Id.) The next day, Plaintiff had his first appointment with CSP's medical director, Defendant Dr. Eric Fogam. (Apple Report at 4; Ross Aff., Doc. 125-1, ¶ 2.) Defendant concedes that he reviewed Plaintiff's file before the appointment and was aware that Plaintiff suffered from *cauda equina* syndrome and was in chronic pain. (Fogam Dep., Doc. 125-34, at 36-37, 80-81.) During this appointment, Plaintiff told Defendant about a pending specialist consultation and Defendant assured Plaintiff he would be sent to Dr. Moore. (Ross Dep. at 37.) Defendant renewed Plaintiff's prescriptions for Lyrica, Baclofen, and Motrin, but did not refer him to Dr. Moore. (Doc. 125-25.) Defendant denies that Plaintiff had a pending consultation and further alleges that Plaintiff was not complaining of uncontrolled pain, and therefore such a referral was unnecessary. (Fogam Dep. at 61-62, 75, 78.)

On December 2, 2010, during an appointment with another CSP physician, Dr. Olantunji Awe, Plaintiff complained that he continued to suffer uncontrolled pain. (Ross Dep. at 63.) Dr. Awe responded by increasing Plaintiff's Baclofen dosage and

prescribing a 90-day trial of Percogesic, a pain reliever. (Awe Aff., Doc. 109, ¶ 10.) On February 7, 2011, at Plaintiff's request, Defendant replaced Plaintiff's Baclofen with Neurontin, a medication that treats neuropathic pain. (Fogam Aff. ¶ 11.)

On February 17, 2011, Dr. Awe ordered an x-ray of Plaintiff's hip, which was injured due to a fall. (Awe Aff. ¶ 11.) During a March 31, 2011 appointment to discuss his x-ray results with Defendant, Plaintiff reported that he continued to experience uncontrolled pain, that the medication he was taking was not effective, and that he needed to see a specialist. (Ross Dep. at 84.) In response, Defendant allegedly accused Plaintiff of malingering and told Plaintiff he "need[ed] to get out of the wheelchair and walk,"[4] and that there was nothing wrong with him other than "a mild case of arthritis." (Ross Dep. at 84.) On April 4, Plaintiff filed a grievance regarding Defendant's treatment, Plaintiff's uncontrolled pain, and his desire to see a pain specialist. (Doc. 125-29.) Pursuant to CSP policy, Defendant allegedly signed a witness statement responding to Plaintiff's complaint.[5] (Doc. 125-30.)

Defendant and Dr. Awe continued to treat Plaintiff with medication over the next year and a half. (Apple Report at 6.) During each of these appointments, Plaintiff complained that he

---

[4] Plaintiff's pain required the use of a wheel chair. (Fogam Dep. at 84.)
[5] Defendant denies signing the witness statement. (Fogam Dep. at 101.)

was still in a great deal of pain, the prescribed medication had no effect, and that he wanted to see a specialist. (Ross Dep. at 63-64.) Unaware of any alternative treatment for Plaintiff but believing a specialist might know better, on March 7, 2012, Defendant ordered a consultation with an orthopedic specialist. (Fogam Aff. ¶ 6.) Nevertheless, Defendant subsequently placed Plaintiff's consultation on hold because:

> (1) The underlying nerve conditions causing [Plaintiff's] chronic pain were irreversible; (2) they were in the process of managing his chronic pain with medication . . . . (3) there were indications - both objective and subjective - that medications were having some effect . . . and (4) they were not aware of any more efficacious treatment . . . .

(Defendant's Statement of Material Facts, Doc. 107-2, ¶ 66.) Plaintiff, on the other hand, denies that his pain improved over this period. (Ross Dep. at 60.) Defendant even conceded that by September 17, 2012, Plaintiff's pain had actually intensified. (Fogam Dep. at 114.)

## B. Defendant's Treatment Between 2012 and 2014

On November 28, 2012, Plaintiff was referred to a specialist, Dr. Michelle Cintron. (Cintron Dep., Doc. 126-33, at 21.) While Defendant intended to send Plaintiff to an orthopedic specialist, Dr. Cintron is a sports management physician. (Id. at 7; Fogam Aff. ¶ 24.) Moreover, because of confusion regarding Defendant's referral form, Dr. Cintron did

not assess Plaintiff for any kind of surgery. (Cintron Dep. at 26.) Instead, Dr. Cintron only recommended Defendant increase Plaintiff's Neurontin dosage. (Id. at 45.) Defendant asserts he was unaware of these referral errors and that he assumed Dr. Cintron had evaluated Plaintiff and decided he was not a candidate for surgery. (Fogam Aff. ¶ 28.)

On January 30, 2013, Plaintiff was sent to a neurologist, Dr. Edward Mendoza. (Mendoza Dep., Doc. 126-36, at 11.) Dr. Mendoza recommended adjusting Plaintiff's medication and ordering an electromyogram to examine Plaintiff's nerve structure. (Mendoza Aff., Doc. 108, ¶ 12.) In July 2014, Defendant left his position at CSP and provided no additional treatment to Plaintiff. (Fogam Dep. at 15.)

## C. Plaintiff's Care From 2014 to Present

Subsequent to Defendant's departure from CSP, Dr. Awe has taken over as medical director. (Awe Aff. ¶ 3.) Plaintiff continued to complain about his pain and on July 23, 2014, Plaintiff had another appointment with Dr. Mendoza, who again recommended adjusting Plaintiff's medication. (Mendoza Aff. ¶ 25.)

Over the next two years, Plaintiff continued to receive treatment from Dr. Awe and Dr. Mendoza. On September 21, 2016, Plaintiff was evaluated by an orthopedic surgeon, Dr. John

DeVine. (DeVine Dep., Doc. 110-1, at 34-40.) Dr. DeVine reported that surgical intervention was not warranted and recommended Plaintiff be referred to a pain specialist. (Id. at 39.) Dr. DeVine did not, however, evaluate Plaintiff for the placement of an SCS or a pain pump. (Id. at 48.)

Plaintiff was next seen by a pain specialist at Augusta University Hospital, Dr. Dan Martin, on November 14, 2016. (Martin Dep. Vol. I, Doc. 110-2, at 33.) Dr. Martin recommended that Plaintiff continue his medications and return in two months. (Id. at 44.) Plaintiff returned on February 27, 2017, and while Dr. Martin did not believe Plaintiff was a suitable candidate for an SCS replacement, he referred Plaintiff for a second opinion. (Martin Dep. Vol. II, Doc. 126-35, at 15-16.)

Plaintiff initiated this suit on August 8, 2011. Plaintiff alleges Defendant violated his Eighth Amendment rights. Defendant now moves for summary judgment and argues that he is entitled to qualified immunity.

## II. LEGAL STANDARD

A motion for summary judgment will be granted if there is no disputed material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Facts are material if they could affect the results of the case. Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248 (1986). The court must view facts in the light most favorable to the non-moving party and draw all inferences in its favor. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The movant initially bears the burden of proof and must demonstrate the absence of a disputed material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The movant must also show no reasonable jury could find for the non-moving party on any of the essential elements. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).

If the movant carries its burden, the non-moving party must come forward with significant, probative evidence showing there is a material fact in dispute. Id. at 1116. The non-movant must respond with affidavits or other forms of evidence provided by Federal Rule of Civil Procedure 56. Id. at 1116 n.3. The non-movant cannot survive summary judgment by relying on its pleadings or conclusory statements. Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981). After the non-movant has met this burden, summary judgment is granted only if "the combined body of evidence is still such that the movant would be entitled to a directed verdict at trial – that is, such that no reasonable jury could find for the non-movant." Fitzpatrick, 2 F.3d at 1116.

### III. DISCUSSION

In his amended complaint, Plaintiff alleges that Defendant was deliberately indifferent to his serious medical need. Plaintiff seeks money damages and equitable relief. Defendant contends that summary judgment is appropriate because he is entitled to qualified immunity. Defendant further contends that Plaintiff's demand for equitable relief is vague and overbroad.

#### A. Qualified Immunity

Qualified immunity protects government officials from suit so long as their conduct does not violate clearly established law. Morris v. Town of Lexington, 748 F.3d 1316, 1321 n.15 (11th Cir. 2014). To be entitled to qualified immunity, the defendant must first show he was acting within his discretionary authority. Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1265 (11th Cir. 2004). The burden then shifts to the plaintiff who must show qualified immunity is not appropriate. Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002).

To do so, the plaintiff must establish that the officer's conduct (1) violated a constitutional right, and (2) that right was clearly established when the violation occurred. Id. Plaintiff does not dispute that Defendant was acting within his discretionary authority. Therefore Plaintiff must show Defendant violated his constitutional right and that right was clearly established.

10

## 1. *Constitutional Violation*

To succeed on a deliberate indifference claim, the plaintiff must show: (1) he had a serious medical need; (2) that the defendant was deliberately indifferent to that need; and (3) that indifference caused the plaintiff's injury. Goebert v. Lee Cnty., 510 F.3d 1312, 1326 (11th Cir. 2007).

The first element of a deliberate indifference claim - serious medical need - requires that the plaintiff show his medical need "is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Goebert, 510 F.3d at 1326 (internal quotations and citations omitted); Brown v. Johnson, 387 F.3d 1344, 1351 (11th Cir. 2004) ("[T]he medical need must be one that, if left unattended, poses a substantial risk of serious harm.").

To prove the second element of a deliberate indifference claim, the plaintiff must establish that the defendant was deliberately indifferent to the plaintiff's serious medical need. To meet this standard, a plaintiff "must prove three facts: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) by conduct that is more than mere negligence." Brown, 387 F.3d at 1351.

The last element of a deliberate indifference claim - causation - requires that a plaintiff "show that the

constitutional violation caused his injuries." <u>Marsh v. Butler Cnty.</u>, 268 F.3d 1014, 1028 (11th Cir. 2001). Causation can be established by the defendant's personal participation in the constitutional violation. <u>Goebert</u>, 510 F.3d at 1327.

Plaintiff's deliberate indifference claims revolve around two incidents: (a) Defendant's failure to refer Plaintiff to any kind of specialist from November 17, 2010 to November 28, 2012; and (b) Defendant's failure to refer Plaintiff to a pain management specialist between November 28, 2012 and June 2014. Plaintiff also seeks injunctive relief to ensure he receives adequate medical care in the future.

a. *Failure to Refer Plaintiff to a Specialist*

Defendant does not dispute, and the record establishes, that Plaintiff has a serious medical need. Plaintiff was first diagnosed with *cauda equina* syndrome in 2004. (Apple Report at 2.) *Cauda equina* syndrome causes chronic pain and mandates treatment. (Fogam Dep. at 179; Apple Report at 2-3.) Accordingly, Plaintiff has established he has a serious medical need. Plaintiff must now prove Defendant was deliberately indifferent to that need and that indifference caused Plaintiff's injury.

To prove the first sub-element of the deliberate indifference element - subjective knowledge - a defendant "must both be aware of facts from which the inference could be drawn

12

that a substantial risk of serious harm exists, and he must also draw the inference." _Farmer v. Brennan_, 511 U.S. 825, 837 (1994). The defendant is not liable for failing to take action if "he should have perceived the risk but did not . . . ." _Id._ at 838. Nevertheless, subjective knowledge can be inferred when the risk was obvious. _Id._ at 842. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." _Id._

There is evidence in the record to show Defendant had subjective knowledge of Plaintiff's uncontrolled pain. Plaintiff argues that the signed witness form - responding to Plaintiff's grievance that he was not receiving adequate treatment for his pain - is evidence of Defendant's subjective knowledge. Despite his name being written at the top of the witness form, Defendant denies signing that form and argues that there is no evidence proving otherwise. Yet Dr. Awe, who also works for CSP, testified that responding to a grievance by filling out such a form was standard protocol at CSP. (Awe Dep., Doc. 126-32, at 65-66; Fogam Dep. at 101.) An organization's routine practice can be used as evidence to prove that practice was followed on a particular occasion. FED. R. EVID. 406. Thus, a jury could infer from CSP's policy that Defendant signed the witness statement responding to Plaintiff's

13

grievance and therefore had subjective knowledge of Plaintiff's uncontrolled pain.

To satisfy the second sub-element of the deliberate indifference element - disregard of the risk - a plaintiff must show the defendant failed to take reasonable measures to abate the risk of harm. Farmer, 511 U.S. at 847. Even if the defendant knew about the risk, he will not be held liable if he acted reasonably in response thereto. Pourmoghani-Esfahani v. Glee, 625 F.3d 1313, 1317 (11th Cir. 2010). Nevertheless, disregard can be established through a single episode of misconduct. Rogers v. Evans, 792 F.2d 1052, 1062 (11th Cir. 1986). As with the other sub-elements, "[d]isregard of the risk is . . . a question of fact that can be shown by standard methods." Goebert, 510 F.3d at 1327.

Plaintiff presents evidence that Defendant disregarded the risk of Plaintiff's serious medical need. Plaintiff's expert, Dr. David Apple, M.D., concluded that after six months of treatment, no reasonable physician could conclude that oral medication was sufficient to treat Plaintiff's pain. (Apple Report at 10; Apple Dep. at 139.) Although Defendant points out that his own expert disagrees with Dr. Apple's assessment, summary judgment does not allow a court to decide which expert is more credible. See Waldrop v. Evans, 871 F.2d 1030, 1035

(11th Cir. 1989) (refusing to grant summary judgment where parties' experts disagreed about whether doctor's treatment was grossly incompetent or otherwise deliberately indifferent). Accordingly, Plaintiff has presented evidence that Defendant's failure to refer Plaintiff to a specialist was unreasonable.

To establish the final sub-element of deliberate indifference, a plaintiff must show the defendant's conduct more than grossly negligent. Goebert, 510 F.3d at 1326. The plaintiff must prove the provider's response to his medical need "was more than merely accidental inadequacy, negligence in diagnosis or treatment, or even medical malpractice actionable under state law." Nimmons v. Aviles, 409 F.App'x 295, 297 (11th Cir. 2011). Medical treatment violates the Eighth Amendment when it is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Rogers, 792 F.2d at 1058. A defendant disregards a risk by more than gross negligence by providing treatment that is grossly inadequate, easier but less effective, or so minimal that it amounts to no treatment at all. McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999).

Plaintiff alleges that Defendant's insistence on a course of treatment he knew was ineffective is conduct that is more than grossly negligent. Greeno v. Daley, 414 F.3d 645 (7th Cir. 2005), is instructive on whether Defendant's conduct rose to the

15

level of a constitutional violation.  There, a prisoner experiencing severe heartburn and vomiting blood repeatedly complained to his doctors that their prescribed treatment of Maalox and Tagamet provided no relief.  After receiving the same ineffective treatment for two years, the prisoner was finally referred to a gastrointestinal specialist who diagnosed him with an esophageal ulcer and prescribed Prilosec.  Id. at 651.  The Seventh Circuit found that the plaintiff's complaint was not merely a disagreement with the medical opinion of his doctors. Id. at 655.  Instead, the court found that spending a year-and-a-half "doggedly persist[ing] in a course of treatment known to be ineffective," could establish an Eighth Amendment violation. Id. at 654-55.

Here, like Greeno, there were numerous signs that the medical treatment provided by Defendant was ineffective.  When Plaintiff was transferred to CSP, his medical records showed he had a pending consultation for pain management.[6]  (Doc. 125-23.)

---

[6] Defendant argues that the form in Plaintiff's file is not a valid consultation form because it was issued when Plaintiff was transferred from PSP to MSP.  (Fogam Dep. 75.)  Yet Plaintiff alleges that Defendant acknowledged that Plaintiff had a pending consultation.  (Ross Dep. at 36.) Accordingly, even if Plaintiff's consultation is invalid, there is evidence that, at the time of Plaintiff's first appointment, Defendant knew that another provider believed it reasonable for Plaintiff to be seen by a specialist.

Defendant also argues that the consultation form is inadmissible because it has not been properly authenticated.  However, Federal Rule of Civil Procedure 56 was amended in 2010 and parties are no longer required to authenticate all documents to be considered at summary judgment.  Agee v. Chugach World Servs Inc., 2014 WL 5795555, at *5 (N.D. Ala. Sept. 30, 2014). Instead, parties only need to show the document can be presented in an admissible form at trial.  Fed. R. Civ. P. 56(c)(2) ("A party may object that

Defendant allegedly acknowledged the existence of Plaintiff's consultation and assured Plaintiff he would be referred to a specialist. (Ross Dep. at 37.) Defendant even concedes that by March 7, 2012, he was unaware of any alternative treatment for Plaintiff and believed he needed to be referred to a specialist. (Fogam Aff. ¶ 16.) Nevertheless, that consultation was put on hold because Plaintiff's pain allegedly improved. (Fogam Dep. at 106-07.) Yet Plaintiff denies that his pain improved and Defendant's own testimony supports Plaintiff's assertion. (Id. at 114.) Furthermore, when Plaintiff complained about seeing a specialist, Defendant accused him of malingering despite his knowledge that Plaintiff had a condition that normally caused excruciating pain. (Ross Dep. at 37.) Plaintiff's expert stated that Defendant's persistence on this course of treatment was "grossly inadequate." (Apple Report at 10.) A reasonable jury could consider this evidence and conclude that Defendant's treatment was grossly inadequate, easier and less effective, or so cursory that it amounted to no treatment at all.

Defendant's argument that this was a mere difference of medical opinion is unconvincing. In Adams v. Poag, 61 F.3d 1537 (11th Cir. 1995), the parents of a deceased inmate alleged that a doctor's failure to schedule a follow-up appointment amounted

---

the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."). Here, because Plaintiff has shown these documents can be authenticated, the consultation form can be considered for summary judgment purposes.

to deliberate indifference. Id. at 1546. The Eleventh Circuit found that the plaintiffs were essentially alleging that the doctor did not diligently pursue alternative treatments, which did not rise beyond negligence. The plaintiffs had not proven the doctor knew the appropriate treatment and failed to provide that treatment. Id. Here, Defendant admits that he knew Plaintiff was not responding to his treatment as of March 7, 2012, and that an orthopedic specialist could help Plaintiff. After coming to this conclusion, however, Defendant put Plaintiff's referral on hold for eight months. (Fogam Dep. at 108.) Accordingly, Defendant's conduct was not a mere difference of medical opinion.

As the last element of a deliberate indifference claim, "[a] plaintiff must also show that the constitutional violation caused his injuries." Marsh, 268 F.3d at 1028. This can be shown by the defendant's personal participation in the constitutional violation. Goebert, 510 F.3d at 1327. Defendant asserts that Plaintiff is not a good candidate for an SCS replacement, which presumably was the only realistic treatment available at that time, and therefore cannot establish causation. Dr. Daniel Martin, who evaluated Plaintiff for an SCS replacement in 2016, testified that he did not consider Plaintiff to be a suitable candidate for an SCS. (Martin Dep.

Vol. II at 15-16.) It appears that Dr. Martin's biggest concern was that Plaintiff only reported a fifty percent reduction in pain as a result of his original SCS implant. (Id. at 11-12.) Dr. Martin stated that when a patient gives a low pain reduction estimate, it shows the patient is uncertain about the effectiveness of the treatment, which is a "bad sign." (Id. at 12.) He explained:

> The patients that really do well with this come in and you don't even have to ask them. They say, I know you're taking this temporary lead out today and I wish you weren't doing it because it's helping so much . . . . . But when they have to think about it, even if they say 95 percent . . . . I don't generally recommend it.

Id. Nevertheless, Plaintiff reported similar numbers and was deemed a suitable candidate when he was implanted with a permanent SCS device in 2006. (Doc. 125-12.) Moreover, Dr. Apple testified that given the severity of Plaintiff's pain, a fifty percent reduction would be sufficient to warrant an SCS, even with the risk of infection. (Apple Dep. at 65; Martin Dep. Vol. II at 9.) Because Plaintiff has submitted evidence that he is a candidate for an SCS replacement and Defendant denied him access to that treatment, causation has been satisfied.

Plaintiff has come forward with evidence in the record that would support finding that Defendant was deliberately indifferent to Plaintiff's medical needs. Plaintiff's condition causes him to experience chronic pain and is a serious medical

need. Despite Plaintiff's repeated complaints that medication provided no relief, Defendant continued to pursue a course of treatment he knew to be ineffective. If a factfinder believes Dr. Apple's testimony regarding the appropriateness of an SCS replacement, it could find Defendant's failure to refer Plaintiff to a specialist caused him to needlessly suffer severe pain.

   *b. Failure to Refer Plaintiff to a Pain Specialist*

Plaintiff also claims that Defendant's failure to send him to a pain specialist between 2012 and 2014 amounted to deliberate indifference. Nothing in the record, however, supports finding that Defendant's choice of referrals constituted more than mere negligence. Plaintiff finds no support from his own expert. Dr. Apple claimed Defendant's care between 2010 and 2012 was grossly inadequate, but there is no similar level of condemnation about Defendant's choice of referrals. (Apple Report at 10.) On the contrary, Dr. Apple testified that "the neurologist [Dr. Mendoza] was probably an okay referral." (Apple Dep. at 139.) To this extent, Plaintiff's claim is no more than a difference in medical opinion between an inmate and his physician. See Hernandez v. Sec'y of Fla. Dept. of Corr., 611 F. App'x 582, 584 (11th Cir. 2015). Dr. Apple did testify that it was unreasonable for Defendant to follow Dr. Cintron's advice that Plaintiff only

required an increase in his Neurontin dosage, but such a mistake would only amount to negligence, which is not actionable under the Eighth Amendment. See Nimmons, 409 F. App'x at 297. Defendant was not continuing the same treatment that had been ineffective in the past. Instead, he referred Plaintiff to specialists who Defendant believed were best suited to provide relief. Defendant's failure to refer Plaintiff to a pain specialist was not treatment that was easier but less effective, grossly inadequate, or so minimal that it amounted to no treatment at all.

## 2. *Clearly Established Right*

Defendant argues that even if he was deliberately indifferent to Plaintiff's serious medical need, refusing to refer Plaintiff to a specialist for two years did not violate a clearly established right and therefore qualified immunity applies. In the Eleventh Circuit, clearly established rights are those set by precedent of the United States Supreme Court, the Eleventh Circuit, or the law of the highest court of the state where the violation took place. Snider v. Jefferson State Cmty. Coll., 344 F.3d 1325, 1328 (11th Cir. 2003). The case does not need to be factually identical before the right is clearly established. Amnesty Int'l, USA v. Battle, 559 F.3d 1170, 1185 (11th Cir. 2009). Instead, the defendant only needs

fair notice that his conduct violated the plaintiff's constitutional rights. Id.

Defendant argues that Plaintiff's right to be referred to a specialist was not clearly established. The law is clearly established, however, "that knowledge of the need for medical care and an intentional refusal to provide that care constitutes deliberate indifference." Poag, 61 F.3d at 1543-44. Furthermore, "[a] core principle of Eighth Amendment jurisprudence . . . is that prison officials with knowledge of the need for care may not, by failing to provide care, delaying care, or providing grossly inadequate care, cause a prisoner to needlessly suffer the pain resulting from his or her illness." McElligott, 182 F.3d at 1257. Therefore, Defendant's entitlement to qualified immunity depends on whether he knew his medical care was ineffective and that a specialist was needed to provide any real relief. Id. Because Plaintiff has come forward with evidence to support such a finding, summary judgment is inappropriate.

Defendant's reliance on Gilmore v. Hodges, 738 F.3d 266 (11th Cir. 2013), is unconvincing. In Gilmore, a prisoner was not provided hearing aid batteries for several years despite his doctor's recommendation that the prisoner use such aids. Although the court decided that treatable hearing loss was a serious medical condition, it recognized such a finding had not

been made by the United States Supreme Court, Eleventh Circuit, or that state's highest court before the violation occurred. <u>Gilmore</u>, 738 F.3d at 278. Here, Plaintiff's serious medical need is management of his chronic pain. The Eleventh Circuit has repeatedly held that pain is a serious medical condition. <u>See e.g.</u>, <u>McElligot</u>, 182 F.3d at 1256 (abdominal pain was a serious medical need); <u>Farrow v. West</u>, 320 F.3d 1235, 1244-45 (11th Cir. 2003) (pain from teeth cutting into gums was a serious medical need). Therefore, Defendant's motion for summary judgment is **DENIED**.

## B. Equitable Relief

In his amended complaint, Plaintiff also seeks "equitable relief necessary to ensure that Mr. Ross receives adequate medical care in the future." (Am. Compl., Doc. 17, at 26.) During his deposition, however, Plaintiff could not describe what that relief should entail beyond ensuring he was given appropriate medical care. (Ross Dep. at 85-87.) Plaintiff's proposed equitable relief is essentially a demand that Dr. Awe, the current CSP medical director, not engage in deliberate indifference that violates his Eighth Amendment rights.[7] The

---

[7] Plaintiff did not identify whether his suit was against Defendant personally or in his official capacity. Nevertheless, Plaintiff's claim for equitable relief is aimed at Defendant in his official capacity. <u>See</u> <u>Lundgren v. McDaniel</u>, 814 F.2d 600, 604 n.2 (11th Cir. 1987) (captions "are not determinative as to the parties to the action"). Because officers sued in their official capacity are automatically substituted upon an official's

Court cannot issue a general injunction against all illegal conduct. See Burton v. City of Belle Glade, 178 F.3d 1175, 1200-01 (11th Cir. 1999) (refusing to grant an injunction prohibiting the City from engaging in illicit discrimination in future annexation decisions); Payne v. Travenol Labs., Inc., 565 F.2d 895, 897 (5th Cir. 1978) ("'[O]bey the law' injunctions cannot be sustained."); Redding v. Georgia, 2012 WL 7004986, at *3 (M.D. Ga. Dec. 20, 2012) (proposed injunction "commanding that Defendants . . . provide Plaintiff with the benefits of medical treatment," was too broad to be enforceable), report and recommendation adopted, 2013 WL 427761 (M.D. Ga. Feb. 4, 2013); see also 18 U.S.C. § 3626(a). Plaintiff's plea for lenience because he "may not be a judge or lawyer" is unconvincing because Plaintiff is represented by counsel. Plaintiff's counsel had ample time to move to amend Plaintiff's complaint to set out a valid claim for equitable relief.

Plaintiff's desire for an assurance that his pain will be properly treated is understandable. The record shows he suffers constant and excruciating pain. The record also shows, however, that treating Plaintiff's condition is no simple matter and that it is very likely that Plaintiff will be in pain for the rest of his life even with proper medical intervention. (Apple Dep. at

departure, Plaintiff's equitable relief may proceed without amending his complaint to add Dr. Awe as a defendant. See FED. R. CIV. P. 25(d).

24

49.) The Court will not complicate that treatment by demanding Plaintiff's physicians do what the law already requires.

## IV. CONCLUSION

Upon the foregoing, Defendant's motion for summary judgment (doc. 107) is **GRANTED IN PART** and **DENIED IN PART.** Defendant's motion is **GRANTED** with respect to his failure to refer Plaintiff to a pain specialist and Plaintiff's request for injunctive relief. Regarding Defendant's failure to refer Plaintiff to any specialist, however, Defendant's motion is **DENIED.**

**ORDER ENTERED** at Augusta, Georgia, this 20th day of March, 2018.

J. RANDAL HALL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA